**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**PAULINE ELIZABETH RAMSEY,**

     **Plaintiff,**

**vs.**                               **CIVIL ACTION NO. 2:20-CV-00734**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

     This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered November 10, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 10, 13)

     Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or for remand (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 13); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Pauline Elizabeth Ramsey, (hereinafter referred to as "Claimant"), protectively filed her application for benefits on April 3, 2019 (Tr. at 14, 290-293) alleging disability since February 16, 2018[1] because of depression, anxiety, fibromyalgia, degenerative disc disease of the cervical and lumbar spine, "BCTS", asthma, COPD, migraines, and insomnia (Tr. at 303). Her claim was initially denied on June 13, 2019 (Tr. at 186-196) and again upon reconsideration on July 10, 2019 (Tr. at 198-206). Thereafter, Claimant filed a written request for hearing on July 26, 2019 (Tr. at 207-208).

An administrative hearing was held on April 7, 2020 before the Honorable M. Drew Crislip, Administrative Law Judge ("ALJ"). (Tr. at 74-111) On April 23, 2020, the ALJ entered an unfavorable decision. (Tr. at 11-36) On May 27, 2020, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 286-289) The ALJ's decision became the final decision of the Commissioner on September 20, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On November 9, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8) Subsequently, Claimant filed a Brief in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 13). Consequently, this matter is fully briefed and ready for resolution.

---

[1] This date is the day after a previous denial of benefits (Tr. at 112-133). That decision was upheld by the Appeals Council on November 16, 2018 (Tr. at 134-138).

**Claimant's Background**

Claimant was 35 years old as of the alleged onset date and defined as a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 29) Claimant has a high school education and worked as a postal clerk/postmaster for thirteen years until 2013. (Tr. at 29, 93)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). That Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this case, the ALJ found Claimant met the insured status requirements through December 31, 2018. (Tr. at 16, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of February 16, 2018 through her date last insured ("DLI"), December 31, 2018. (Id., Finding No. 2) At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; Ehlers-Danlos Syndrome; fibromyalgia; affective disorder; and anxiety disorder. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform a limited range of sedentary work through her DLI:

> The claimant can lift, push, pull, and carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and/or walk for 2 hours in an 8-hour workday; and can sit for 6 hours in an 8-hour workday. She must alternate from standing or walking to sitting for 2-3 minutes after every 1 hour of standing or walking. She will be able to remain on task during all position changes, though some will be covered by typical work breaks or time off task. She can operate foot controls occasionally. She can operate hand controls occasionally. She can occasionally reach overhead; and can reach in all other directions frequently. She can climb ramps and stairs occasionally. She can climb ladders, ropes, or scaffolds occasionally, limited to a short rolling ladder apparatus, such as in home improvement stores. She can balance occasionally with "balance" defined as the ability to maintain body equilibrium to prevent falling when walking, standing, crouching, or running on slippery, erratically moving, or very narrow surfaces. She can stoop occasionally, but can never kneel, crouch or crawl. She can never work at unprotected heights, in proximity to moving mechanical parts of dangerous

machinery, in the operation of any sort of motorized vehicle, or in extreme cold, extreme heat, pulmonary irritants, or vibration. She can tolerate occasional exposure to humidity and wetness; and can tolerate frequent exposure to weather. She would be off-task for 10% of the workday in addition to normal work breaks. She cannot perform high production rate work. She can tolerate only occasional interaction with supervisors, coworkers, and the public. She cannot perform teamwork or direct customer service.

(Tr. at 21, Finding No. 5) At step four, the ALJ found Claimant was not capable of performing her past relevant work through her DLI. (Tr. at 29, Finding No. 6) However, in addition to the immateriality of the transferability of job skills, the ALJ noted that Claimant's age, education, work experience and RFC that there were other jobs Claimant could perform through her DLI. (Tr. at 29-30, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from February 16, 2018 through December 31, 2018. (Tr. at 31, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that that the ALJ erred in several respects: (1) that he failed to pose a hypothetical question or assess the RFC to account for her limitations in concentration, persistence and pace, being off-task, alternations between standing, walking, and sitting, absenteeism, and bilateral fine manipulation; (2) that he failed to explain how he arrived at his RFC assessment, particularly with respect to Claimant's limitations in concentration, persistence and pace, being off-task 10% of the workday, absenteeism, alternations between standing, walking, and sitting, and bilateral fine manipulation; (3) that the ALJ erred by disregarding the opinion of Claimant's treating physicians; and (4) that the ALJ improperly did not adopt the findings of Claimant's treating physician or the vocational expert in his RFC and did not explain why; and that the ALJ abused his discretion by failing to fully and fairly develop the record and adopted a "prosecutorial style" by attempting to draw adverse inferences from trial inconsistencies in the record to support

a predetermined nondisability finding (ECF No. 10 at 3, 7-17). Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 17-18)

In response, the Commissioner asserts that the ALJ expressly accounted for Claimant's limitations in her ability to concentrate, persist and maintain pace with an RFC finding that allowed her to be off-task 10% as well as precluding high production rate work. (ECF No. 13 at 8-9) The ALJ's RFC assessment in this respect was nearly identical to that endorsed by the testifying mental health expert which provides ample explanation. (Id. at 9-10) The Commissioner points out that Claimant's conclusory argument that the RFC sit-stand option is unsupported by substantial evidence is essentially a waiver of this argument, however, the ALJ discussed the evidence of record to support this finding and is supported by substantial evidence. (Id. at 11-12) The ALJ also reasonably concluded there was insufficient evidence to support manipulative limitations or absenteeism. (Id. at 13) The Commissioner also points out that despite Claimant's reliance on outdated law to challenge the ALJ's evaluation of her treating physician's opinion, the ALJ nevertheless appropriately determined that the opinion was not persuasive because it was inconsistent and unsupported by the rest of the medical evidence. (Id. at 14-16) Finally, the Commissioner argues that Claimant's argument that the ALJ abused his discretion by adopting a "prosecutorial style" hearing should be rejected and the ALJ developed the record fully and fairly as he had both a medical expert and mental health expert testify at the hearing. (Id. at 16)

The Commissioner contends that substantial evidence supported the ALJ's decision and asks this Court to affirm. (Id. at 17)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Medical Evidence:

Prior to the relevant period, diagnostic testing from March 2017 revealed non- compressive central subligamentous disc protrusion at the L5-S1 level of Claimant's lumbar spine; the imaging was otherwise unremarkable with no additional compressive disc herniation or central canal stenosis (Tr. at 381-382). An MRI of the thoracic spine showed paracentral disc protrusion at T7-T8 causing a slight deformity of the thecal sac, but there was no compression of the cord itself, no additional disc herniation, no central canal stenosis, and no neural foraminal narrowing (Id.). An x-ray of the cervical spine from October 2017 demonstrated excellent alignment with a normal lordotic curvature, vertebral bodies of normal density and height, normal intervertebral disc spaces, no rotation or scoliosis, no spondylosis or spondylolisthesis, and unremarkable prevertebral soft tissues and air column (Tr. at 485).

Imaging studies performed during the relevant period, from October 2018, showed mild nonspecific straightening of the cervical lordosis and minimal, if any, degenerative changes of the cervical spine, no acute fracture or malalignment, and no significant bony neural-foraminal deficiency (Tr. at 722). A subsequent MRI of the cervical spine from November 2018 noted multilevel disc bulging but no evidence of disk herniation, acute fracture, subluxation, or focal cervical spinal cord signal abnormality (Tr. at 721).

A tender-point examination confirmed a fibromyalgia diagnosis, along with Claimant's

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

complaints of fatigue, diffuse pain and stiffness, headaches, numbness and tingling, and brain fog (Tr. at 401, 405, 882-883, 994-1008). She also received a differential diagnosis of Ehlers-Danlos Syndrome, hypermobile type; an examination from after her DLI, in February 2019, noted hypermobile joints, unspecific unilateral weakness, and hyperextensible skin but was negative for dystonia, atrophy, distress, thumb or wrist sign, easy bruising, abnormal scarring, or "party tricks," and indicated a normal gait (Tr. at 497, 645, 649, 798, 803, 861, 884-888).

Medical records from Claimant's primary care providers noted tension in the left trapezius and tenderness to palpation on October 16, 2018; examinations from October 30, 2018 and December 11, 2018 noted tension in the bilateral trapezius, tenderness to palpation, and limited range of motion; these examinations, however, were otherwise unremarkable with findings of normal movement of all extremities, normal gait, normal ambulation, normal reflexes, and no acute distress (Tr. at 641, 649, 653, 657-658, 661-62, 665, 669, 673, 677, 684, 688, 691, 1028, 1033, 1037-38, 1043, 1047, 1051, 1055, 1059).

Claimant also attended four physical therapy sessions during the relevant 10-month period, however, she declined treatment on the third visit due to neck pain (Tr. at 552) and was discharged shortly afterwards because she never rescheduled (Tr. at 553). Nevertheless, records noted tenderness to palpation in the shoulders, cervical facet joints, and sacroiliac joint; an unspecified degree of decreased range of motion in the cervical spine; axial back pain; a positive Patrick-Fabre test; and tactile dysesthesia; however, these examinations were otherwise unremarkable with findings of no hand weakness, no tenderness to palpation in the lumbar spine, no pain on active range of motion, normal sensory testing to light touch, no numbness in the lower extremities, no lower extremity weakness, and normal deep tendon reflexes (Tr. at 446, 450, 463).

10

Claimant's Self-Reports:

In her Function Report, Claimant reported being able to prepare simple meals two or three times a week using a crockpot and a microwave; she endorsed being able to launder clothes and wash dishes with her daughter (Tr. at 320-321). She also reported being able to attend to her personal care with assistance from her daughter (Id.). She stated she would go outside daily, unless it was cold, raining or snowing; that she can go out alone; that she can drive a car; shop for groceries; and handle her own finances (Tr. at 322). She listed her hobbies as fishing, hunting, and playing bingo, but only fishes because of her conditions (Tr. at 323).

**The Administrative Hearing**

Mary Eileen Buban, Psy.D., Mental Health Expert Testimony:

Dr. Buban testified that she reviewed the file as related to her area of expertise. (Tr. at 79-80) She noted that the record supports Claimant's complaints of major depressive disorder and anxiety disorder, but noted that "one of the problems with this record" is that when she started treatment in March 2019, a mental residual functional capacity form was completed just after the initial assessment. (Tr. at 80-81) Dr. Buban also observed Claimant's primary care provider indicated Claimant "had absolutely no complaints for psychological, psychiatric concerns, and memory, concentration were intact." (Tr. at 81) She noted there "is a lot of conflicting information in the record" and "essentially not a whole lot of mental health treatment." (Id.) Dr. Buban further observed that the most recent mental health treatment was from July 2019 and that there was an allegation of PTSD but not a major condition (Tr. at 81-82); Dr. Buban agreed that the record was "puzzling" because it indicated Claimant was not referred to mental health treatment until January

11

17, 2020 (Tr. at 83). Dr. Buban opined that Claimant's mental impairments satisfied neither "paragraph C" nor "paragraph B" criteria. (Tr. at 82)

In response to questioning from Claimant's attorney, Dr. Buban testified that although Claimant was referred to mental health treatment on September 11, 2018 by her primary care provider, she did not begin that treatment until March 2019; Dr. Buban noted that when the referral was made, the record states that Claimant had a diagnosis for depressive disorder with an onset of July 10, 2018. (Tr. at 84-85) Dr. Buban noted that the September 11, 2018 record contained diagnoses for mixed anxiety and depressive disorder, although under the review of systems it provides "no depression, no sleep, and no anxiety, and no fatigue" and the mental status examination was within normal limits for mood and memory. (Tr. at 84)

Dr. Buban opined Claimant would have moderate limitations in her abilities to understand, remember, and apply information, interact with others, and concentrate persist, and maintain pace. (Tr. at 82) Dr. Buban testified that Claimant would be capable of simple, detailed, and complex previously learned tasks, but because of the complaints of depression, preclude new complex tasks. (Id.) She would also restrict Claimant from tasks involving customer service work and tandem teamwork and a limit Claimant to a "normal work pace with no fast-production quota work." (Id.)

Gilberto Munez, M.D., Medical Expert Testimony:

Dr. Munez identified Claimant's physical impairments: Ehlers-Danlos Syndrome; asthma; fibromyalgia; cervical spine disc disease; lumbar spine disc disease; hyperthyroidism; irritable bowel syndrome; and chronic urticaria. (Tr. at 87) He opined that none of Claimant's physical impairments singly or in combination met listing levels (Id.); however, Dr. Munez opined that Claimant's physical impairments would limit her to a full range of sedentary work. (Tr. at 88) He

12

testified that Claimant has postural limitations, to "occasionally", but she cannot climb ladders or scaffolds; he further opined that Claimant cannot work at unprotected heights, around moving mechanical parts, or drive commercially. (Id.) He testified that Claimant can only be exposed occasionally to extreme cold, wetness, humidity, fumes, odors, dust, pulmonary irritants, and vibration. (Id.) Dr. Munez testified that Claimant does not have manipulative issues, as there is no medical impairment. (Id.)

In response to questioning by Claimant's attorney, Dr. Munoz testified that he saw no evidence of cervical radiculopathy (Id.); Dr. Munoz admitted he saw evidence of spasmodic torticollis, but "didn't mention it because it's a spasm and it's not supposed to last one year." (Tr. at 89) He confirmed that the record did not show evidence that Claimant had limitations with her left upper extremity, or that Claimant's fibromyalgia affected her upper extremities. (Id.) Dr. Munoz further testified that he saw no evidence of abnormal headaches or migraines to support it being a chronic condition; he also saw no evidence of limitations or problems with the knee. (Tr. at 90)

<u>Nancy Shapero, Vocational Expert ("VE") Testimony:</u>

The VE confirmed that her testimony will be consistent with the Dictionary of Occupational Titles ("DOT") and advise to the contrary. (Tr. at 93) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience with the RFC described *supra* (Tr. at 99-100) The VE responded that such a person could perform the position of an addresser, a circuit board assembler, and an inspector. (Id.) The VE further testified that should the individual be off-task 15% in addition to normal breaks or were absent two days per month on a consistent basis, all the jobs would be ruled out. (Tr. at 100-101)

In response to questioning by Claimant's attorney, the VE testified that if the individual were limited to occasional reaching, handling, fingering, and feeling, then none of the jobs identified would remain or any other jobs. (Tr. at 104-105) The VE testified that if the individual were capable of performing simple, routine, and repetitive work, with only occasional or superficial contact with coworkers, supervisors, and the general public, the jobs would remain. (Tr. at 105) The VE also opined that if the individual was unable to maintain attention and pace for two-hour segments, the jobs would be ruled out. (Id.) However, if the individual was not expected to perform new and unfamiliar tasks as primary work duties without orientation, then the individual would remain capable of the sedentary jobs identified. (Tr. at 106-107) In response to additional questioning by the ALJ, the VE testified that if the individual were limited to exposure to no more than moderate noise, and no flashing or glaring lights, but no restriction to fluorescent lights of a typical office, the jobs would remain, but maybe not the inspector job. (Tr. at 108)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

Claimant must show that she became disabled prior to the expiration of her insured status on December 31, 2018. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. Thus, to reiterate, to be entitled to DIB in this case, Claimant bears the burden of showing that she became disabled prior to December 31, 2018, the date when her insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after her date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370, at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is from February 16, 2018, the date of Claimant's alleged disability onset, to December 31, 2018 when her insured status expired (Tr. at 15, 16, 31).

**Analysis**

As an initial matter, Claimant has also alleged that the ALJ "failed to hold a full and fair hearing" and "adopted a 'prosecutorial style' in which he attempted to draw adverse credibility inferences from trivial and irrelevant inconsistencies in the record[.]" (ECF No. 10 at 3-4). Claimant

offers nothing in support of this argument. From the undersigned's review of the hearing transcript, the ALJ once directed Claimant's counsel not to pose questions to the vocational expert to which the answers were obvious and once asked Claimant's counsel to define what he meant by "unable to adjust to routine changes in a work setting" in subsequent questioning to the vocational expert. (Tr. at 105-107) Following the vocational expert's testimony, the ALJ invited Claimant's counsel to either, or both, examine his client or make a closing – Claimant's counsel advised the ALJ that he had no questions for Claimant and made a closing statement instead. (Tr. at 109) Further, it is notable that the ALJ recognized that Claimant had "been through this process before having a hearing like this. So you're more familiar with it than the average person would be." (Tr. at 78) The transcript makes clear that Claimant's counsel not only questioned the medical and psychological experts, but also the vocational expert during the hearing, and he opted out of questioning his own client. Accordingly, to the extent Claimant argues the ALJ failed to hold a full and fair hearing or adopted a "prosecutorial style" during same, this argument lacks merit.

The Duty to Develop the Evidence:

The undersigned first addresses Claimant's conclusory argument that the ALJ "abused his discretion when he failed to fully and fairly develop the record and make full and fair inquiry into each matter at issue and obtain evidence necessary to resolve conflicts or differences in the evidence." (ECF No. 10 at 17) In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained

16

that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that she is disabled.  20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process.  Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W. Va. Jan. 4, 2011)(Eifert, M.J.)(citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record *does not require him to make specific inquiries into*

*Claimant's treatment modalities or search for cumulative evidence*; his duty is to obtain sufficient evidence upon which he can render an informed decision. Id. (internal citations omitted) (emphasis added).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Claimant does not specify what evidence the ALJ supposedly failed to obtain or where he failed to reconcile the conflicts in the evidence. Claimant only complains the ALJ found affective disorder and anxiety disorder to be severe impairments, while "stating that there were no objective findings of record" to support the diagnoses of post-traumatic stress disorder, depression, agoraphobia and anxiety. (ECF No. 10 at 17) Claimant again does not specify or explain how the ALJ's findings prejudice her claim. Regardless, the undersigned **FINDS** Claimant's argument to this extent lacks merit.

Early on in the written decision, the ALJ noted the record contained references to post-traumatic stress disorder and panic disorder. (Tr. at 18, "*See, e.g.*," 994-1009) (italics in original) However, while the ALJ noted that the evidence before him was insufficient to firmly establish those impairments as medically determinable, he did not deny that Claimant "does not actually experience these maladies or some symptoms thereof." (Tr. at 18) Nevertheless, the ALJ found anxiety disorder medically determinable and determined that "all restrictions that would flow from those conditions already are included based upon anxiety disorder." (Id.)

18

With respect to the other ailments, the ALJ expressly considered the medical evidence the relevant period and noted Claimant endorsed memory loss, nervousness, depression, and insomnia but during the same period, she also "has frequently denied and/or not reported active symptoms, including fatigue, depression, anxiety, insomnia, loss of interest, and stress. (Tr. at 25, 521, 646-677, 882, 899) The ALJ also observed that during the relevant period, Claimant mostly discussed these conditions with her primary care provider, and the mental status examinations during this period were unremarkable. (Tr. at 25, 653, 657-658, 661-662, 665, 669, 673, 677) The ALJ further noted that other records during the relevant period also showed that Claimant's mental status examinations were consistently unremarkable, generally indicating normal mood and affect, fully oriented to all spheres and cooperative behavior (Tr. at 25, 563, 566, 587, 882, 886), although the ALJ did note that there was a finding of flat and depressed mood from May 2018, but "this was briefly after the passing of the claimant's mother" (Tr. at 25, 569).

Significantly, the ALJ noted that Claimant "did not enter specialized mental-health care until March 2019", which clearly postdated her DLI. (Tr. at 25) From this post-DLI evidence, the ALJ acknowledged Claimant:

> reported symptoms that were not previously or were rarely noted, including frequent tearfulness; severe panic attacks, with palpitations, smothering feelings, and hyperventilation; difficulty in public places; PTSD-related symptoms, including recurrent bad dreams, nightmares, and flashbacks; feelings of hopelessness and helplessness; daily mood swings; and irritability and agitation. The claimant also reported poor concentration and focus, being easily distracted, and difficulty completing tasks and organizing herself.

(Id.) The ALJ noted that the initial status examinations seemed to corroborate Claimant's alleged symptoms, but by her last appointment in May 2019, the mental status findings appeared to show improvement. (Tr. at 25-26, 994-1009, 1010-1012) Of importance here, however, the ALJ

observed that "[a]lthough these specialized records appear to evidence significant limitations in some areas, the severity does not reasonably relate back to the period at issue." (Tr. at 26) Of further significance, the ALJ found these "remarkable findings are largely inconsistent with the findings prior to the [DLI] . . . they are also inconsistent with contemporaneous and subsequent examinations within other treatment records." (Tr. at 25, 641, 645, 886, 899, 911, 915, 1051, 1055, 1059) The ALJ also considered the opinions provided by the testifying psychological expert, Dr. Buban, the prior ALJ decision, the state agency psychological consultants, including the March 20, 2019 opinion from Claimant's psychiatrist, Dr. Ahmed Faheem, discussed further *infra*. (Tr. at 26-28, 29, 112-133, 139-159, 161-179, 994-1009)

The aforementioned clearly demonstrates that the ALJ fully and fairly developed the record as well as reconciled the conflicts presented from this evidence.

Evaluation of Medical Opinion Evidence:

As noted *supra*, Claimant alleged that the RFC assessment is erroneous due in large part to the ALJ's treatment of Dr. Faheem's opinion. (ECF No. 10 at 13-14, 14-16) As observed by the Commissioner, Claimant bases her argument on outdated legal authority, and because Claimant's application was filed after March 27, 2017, 20 C.F.R. § 404.1520c applies to her claim. Indeed, the ALJ explicitly applied the regulatory framework pursuant to Section 404.1520c when discussing Dr. Faheem's opinion (Tr. at 21, 29) Additionally, it has long been recognized that the RFC assessment lies squarely with the ALJ, not with any medical provider/examiner. 20 C.F.R. § 404.1546(c); see Felton-Miller v. Astrue, 459 Fed. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). Thus, to the extent that Claimant contends the ALJ's mental RFC assessment did not incorporate Dr. Faheem's opinion,

this contention lacks merit.

Moreover, the applicable Regulations provide that a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). The Regulations also define "findings . . . about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review" as "prior administrative medical finding[s]." Id. at § 404.1513(a)(5).

In this case, the ALJ properly applied Section 404.1520c, which emphasizes the supportability and consistency factors when assessing the persuasiveness of the medical opinions of record; moreover, an adjudicator is not bound to give any specific weight or deference to any medical provider's opinion, including those provided by treating sources. Id. § 404.1520c(a). Instead of assigning weight to medical opinions, the ALJ now just considers the persuasiveness of a medical opinion (or a prior administrative medical finding). Id. Critically, the source of the opinion is not the most important factor in evaluating its persuasive value, instead, the most important factors are supportability and consistency. Id. § 404.1520c(b)(2). When discussing the finding about whether an opinion is persuasive, the ALJ need only explain how she considered the "the most important factors" of supportability and consistency. Id. § 416.920c(c). The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. Id. § 404.1520c(b)(2)-(3).

With this in mind, the ALJ's finding Dr. Faheem's opinion unpersuasive is reasonable: the ALJ found it was "not wholly congruent with or supported by the medical evidence of record."

(Tr. at 29, 994-1009) The ALJ first noted that Dr. Faheem completed a mental impairment questionnaire on March 20, 2019, "the day of the claimant's initial appointment." (Id.) The ALJ then observed that Dr. Faheem's opinion appears to rely heavily on Claimant's self-reports, explaining "as the identified 'clinical findings' are simply a list of the claimant's reported symptoms." (Id.) The ALJ also noted that it did not appear that Dr. Faheem had reviewed any other medical evidence, "as there are vague statements such as that the claimant 'has had symptoms for quite some time,' without any indication for specific length or severity." (Id.) Significantly, the ALJ noted that Dr. Faheem "incorrectly stated that the claimant was being treated with counseling, when, in fact, treatment notes from that date state that Dr. Faheem merely 'suggested that [the claimant] get involved with counseling.' " (Id.) The ALJ also observed that Dr. Faheem rendered his opinion based on outdated criteria, but considered them to the extent it could be translated to the new criteria, but specifically found that in concentration, persistence, and pace, the evidence did not support his finding that Claimant had marked limitation in this area of functioning. (Id.) Finally, the ALJ determined that to the extent his RFC assessment was similar or identical with Dr. Faheem's, "it is coincidence". (Id.)

In addition to the ALJ's consideration of the mental health treatment record during the relevant period, *supra*, the undersigned **FINDS** the ALJ's overall impression of Dr. Faheem's opinion, including the finding that it was "unpersuasive", is supported by the substantial evidence.[3]

The RFC Assessment and Hypothetical Questions to the Vocational Expert:

---

[3] As an additional matter, the undersigned finds troubling Claimant's argument that the ALJ's failure to give "substantial weight" to Dr. Faheem's opinion as "Doctor Faheem had the opportunity to observe and examine plaintiff on multiple occasions giving the most detailed accounts of the plaintiff's mental condition" (ECF No. 10 at 15). At best, Claimant misinterprets, or at worst, misrepresents the evidence that was before the ALJ related to the relevant period. As the ALJ properly observed, Dr. Faheem's opinion was provided ***the same day*** Claimant began treatment – therefore, there was absolutely NO evidence at the time he rendered his opinion that Claimant was examined by Dr. Faheem "on numerous occasions" (Id.).

The gravamen of Claimant's appeal centers on the ALJ's RFC determination: (1) that it only accounted for Claimant being off-task 10% despite finding she had moderate limitations in her ability to concentrate, persist and maintain pace; (2) that the sit/stand/walk alternation is not supported by substantial evidence; (3) that it failed to account for Claimant's absenteeism; and (4) that it failed to account for Claimant's bilateral fine manipulation limitations, as the ALJ omitted this restriction in the hypotheticals. (ECF No. 10)

A claimant's RFC represents the *most* that the individual can do despite his limitations or restrictions. See Social Security Ruling ("SSR") 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). As noted *supra*, the RFC determination is an issue reserved to the Commissioner. Id. § 404.1546(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller v. Astrue, 459 Fed. App'x at 231.

Regarding Claimant's first point of contention with the RFC assessment, as pointed out by the Commissioner, the Fourth Circuit recently held that there is no "categorial rule" regarding the specific limitation in an RFC assessment required for a claimant with moderate limitations in concentrating, persisting or maintaining pace. See Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir.

2020) (citing <u>Biestek v. Berryhill</u>, 139 S.Crt. 1148, 1157, 203 L.Ed.2d 504 (2019)). Even if the adjudicator only provides for such limitations by restricting a claimant to simple, routine, repetitive tasks, the RFC is appropriate when the adjudicator explains why the evidence supports the limitation and substantial evidence supports the finding. <u>Id</u>. In this case, the ALJ found Claimant had a moderate limitation in concentration, persistence and maintaining pace:

The ALJ noted that treatment records contained some findings of impaired concentration "albeit after the alleged onset date; however, findings are generally unremarkable or unnoted" (Tr. at 20, 557-626, 638-789, 882-967, 994-1009, 1010-1012)[4] Nevertheless, the ALJ recognized that Claimant's physical ailments cause her pain and fatigue, "which can cause distractions from concentration, persistence and/or pace such that at times her effectiveness in a[] work setting would be hampered. This is accounted for by such time off task of 10% in addition to normal work breaks and a preclusion from high-production rate work." (Tr. at 20) Later in the written decision, the ALJ noted that Dr. Buban is the only mental health professional to have reviewed the entire record, and found her opinion consistent with and supported by the record; however, the ALJ noted that he did not limit Claimant to previously learned complex tasks, as he found Claimant had only a mild limitation in understanding, remembering, or applying information. (Tr. at 27; see Tr. at 20) The ALJ further noted that the "slight departure" from Dr. Buban's opinion has no practical impact on the outcome of the decision, as he had found, through the assistance of the vocational expert,

[4] From the undersigned's review of the evidence referenced herein, it appears that the reference to "the alleged onset date" is a scrivener's error, and should have been referring to after the expiration of DLI. The ALJ cites records from the Asthma & Allergy Center, dated January 11, 2018 through January 8, 2019; treatment records from Access Health in Fayetteville, dated March 27, 2017 through March 14, 2019; treatment records from WVU Health, dated May 9, 2018 through May 20, 2019; and treatment records from Appalachian Psychiatric Services, dated March 20, 2019 through July 29, 2019. None of these records from the relevant period indicated Claimant suffered concentration deficits, but only after Claimant's DLI is there any indicia of such deficits, beginning with her initial assessment by Dr. Faheem at Appalachian Psychiatric Services.

that Claimant remained capable of performing unskilled work. (Tr. at 27)

Obviously, the ALJ accounted for Claimant's moderate limitations in concentration, persistence and pace, and explained how he arrived at this conclusion; thus, to the extent Claimant has argued otherwise, this argument is without merit.

Regarding the second point, Claimant only challenges the RFC's stand/sit/walk option to the extent that the ALJ cites no medical evidence to support this limitation. Oddly, Claimant does not specify or explain how this limitation prejudices her or offers further argument on this issue. To that extent, Claimant has waived any argument on this issue. See Erline Co. S.A. v. Johnson, 440 F.3d 648, 653 n.7 (4th Cir. 2006); *accord* Sedghi v. Patchlink Corp., 440 Fed. App'x 165, 167 (4th Cir. 2011) ("By advancing only a conclusory argument, Sedghi has likely waived the issue."); Carter v. Astrue, 413 Fed. App'x 899, 906 (7th Cir. 2011) (internal quotation marks omitted ("it is not this court's responsibility to research and construct the parties' argument . . . conclusory analysis will be construed as waived"). In any event, the ALJ recognized Claimant's assertion that she is unable to work due to limitations in her ability to stand, walk, and sit, among others (Tr. at 22, 319-326, 324-331).[5]

In addition, the ALJ considered the medical evidence related to her cervical and lumbar spine impairments, noting that despite a non-compressive central subligamentous disc protrusion at L5-S1, as well as a paracentral disc protrusion at T7-T8, imaging results were unremarkable (Tr. at 22, 381, 382). The ALJ also reviewed imaging studies from October 2018 and November 2019, after the expiration of her DLI, which indicated mild non-specific straightening of the cervical

---

[5] It is also significant that in her Disability Reports – Appeal, submitted in June and July 2019, several months after the expiration of her DLI, Claimant reported that she is unable to do any "prolonged standing, walking or sitting" (Tr. at 335) and that her doctor advised her "to sit no longer than 45 minutes at a time" and that she cannot stand "for more than 30 minutes without having to sit" and she cannot walk "for more than 10-15 minutes" (Tr. at 348).

lordosis, and multilevel disc bulging at C3-C4, respectively, otherwise, the studies revealed no remarkable findings (Tr. at 22-23, 722, 721). The ALJ also reviewed the evidence related to Claimant's fibromyalgia, again, noting her reports of fatigue, diffuse pain, stiffness, headaches, numbness and tingling (Tr. at 23, 432, 436, 882-883, 994-1008); the ALJ noted the differential diagnosis of Ehlers-Danlos syndrome, hypermobile type, and observed that although Claimant underwent a specialized evaluation after her DLI, in February 2019, there were simultaneous findings of hypermobile joints, unspecified unilateral weakness, and hyperextensible skin, but also no evidence of dystonia, atrophy, distress, thumb or wrist sign, easy bruising, abnormal scarring, or "party tricks", and normal gait (Tr. at 23, 425, 645, 649, 798, 803, 861, 884-888). The ALJ also reviewed the evidence including physical examinations from prior to and after the expiration of Claimant's DLI which showed she had normal movement of all extremities, normal gait, normal ambulation, normal reflexes, and no acute distress (Tr. at 23, 641, 649, 653, 657-658, 661-662, 665, 669, 673, 677, 684, 688, 691, 1028, 1033, 1037-1038, 1043, 1047, 1051, 1055, 1059). The ALJ even reviewed records from Claimant's pain clinic examinations during the relevant period which also showed no numbness in the lower extremities and no lower extremity weakness, among other findings (Tr. at 23, 450).

In sum, the ALJ's review of the record of evidence relating to Claimant's limitations in sitting, standing and walking demonstrates that the ALJ's finding on the stand/sit/walk option is a reasonable limitation in the RFC assessment. Further, the undersigned **FINDS** this option is supported by the substantial evidence.

Next, regarding the third point of contention, that the ALJ failed to adopt Dr. Faheem's and the vocational expert's limitations concerning Claimant's absenteeism, to the extent that

Claimant has argued that the ALJ discounted Dr. Faheem's opinion on this issue[6], the undersigned has already addressed that matter, *supra*. Nevertheless, in light of Claimant's argument that the ALJ posed an incomplete hypothetical to the vocational expert by failing to include Claimant's proposed absenteeism, it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, the undersigned **FINDS** that the ALJ's hypothetical questions, and the vocational expert's responses to same, were supported by substantial evidence.

Finally, regarding Claimant's complaint that the RFC is erroneous because the ALJ failed to address Claimant's bilateral manipulative limitations, as SSR 96-9p[7] specifically provides that such limitations would seriously erode the sedentary occupational base (ECF No. 10 at 17), this

---

[6] Dr. Faheem opined that Claimant would be absent from work on average two to three days per month, unable to complete an eight-hour workday two to three days per month, and expected to perform a job eight hours per day, five day per week on a sustained basis less than 80% of the time (Tr. at 1003).

[7] See SSR 96-9p, 1996 WL 374185, at *8 (**bold** and *italics* in original):

> **Manipulative limitations:** Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. For example, example 1 in section 201.00(h) of appendix 2, describes an individual who has an impairment that prevents the performance of any sedentary occupations that require bilateral manual dexterity (i.e., "limits the individual to sedentary jobs which do not require bilateral manual dexterity"). When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.
>
> The ability to feel the size, shape, temperature, or texture of an object by the fingertips is a function required in very few jobs and impairment of this ability would not, by itself, significantly erode the unskilled sedentary occupational base.

argument lacks merit: the undersigned reviewed the medical record cited by Claimant in her brief that shows her bilateral fine manipulation limitations and has found that ***none*** of these records specifically endorse such limitations.[8] Significantly, ***none*** of these records contained any references, reports or opinions from any provider as to what degree Claimant's fine manipulation is limited or endorsed any manipulative restrictions that concern the relevant period under review that was before the ALJ. Regardless, the ALJ acknowledged Claimant's allegations concerning difficulties using her hands (Tr. at 22, 319-326, 327-331) (the Function Reports post-dating the DLI), but also considered the pain clinic records from 2018 that showed no hand weakness (Tr. at 23, 446, 450, 463). Moreover, the ALJ considered post-DLI neurology records from March 25, 2019 to May 20, 2019 that showed progressive left-sided weakness, neck and back pain, and tremors and physical examinations noting tremors with outstretched hands (Tr. at 24, 894-917); the ALJ further noted that although Claimant was to undergo an NCS/EMG study, there was no evidence

---

[8] Claimant twice refers to Exhibits 7F, 9F, 10F, 13F, and 18F (ECF No. 10 at 13, 17) as having reported "bilateral hand pain, weakness, nerve conduction and tremors which were worse on the left then on the right." However, from the undersigned's review of this evidence, Exhibit 7F concerned the October 2018 physical therapy records to address Claimant's head and neck pain and cervical range of motion deficits, but only mentioned decreased left hand grip strength (Tr. at 547). Exhibit 9F concerned a physical residual functional capacity assessment by Arthur Smith, PT, completed on February 26, 2020, long after the expiration of Claimant's DLI; it noted Claimant is right-hand dominant and limited to lifting/carrying up to five pounds and reaching/handling/fingering/feeling as well as pushing/pulling occasionally and to never reaching overhead (Tr. at 629, 631). Exhibit 10F concerned medical records from Claimant's primary care provider, Jessica Swank, M.D., but of those pertaining to the relevant period, left finger numbness was noted on October 16, 2018 (Tr. at 657) and left-hand numbness on October 30, 2018 (Tr. at 653) and there was mention of a hand x-ray. Exhibit 13F concerned medical records from WVU dated April 2018, February and March 2019; only after the expiration of Claimant's DLI were tremors with outstretched hands noted, on March 25, 2019 (Tr. at 859), although no tremors were noted on February 21, 2019, though weakness was sometimes reported (Tr. at 862, 861). Finally, Exhibit 18F concerned additional WVU records from March 2019 through May 2019, again post-dating Claimant's DLI. There was no mention of bilateral fine manipulation deficits, or "nerve conduction" or bilateral hand pain. However, Claimant reported "weakness on left side for 5 years, gradually worse" and "tremulous ness for years" (Tr. at 976) and her "coordination" was observed to be "tremulous with outstretched hands" (Tr. at 975).

Claimant also asserted that the ALJ "provided no such explanation for discrediting the claimant's testimony regarding her bilateral fingering impairment" (Id. at 10), however, nowhere in the transcript is there any indication that Claimant testified about bilateral fingering limitations before this ALJ – she only provided testimony concerning her last relevant work as a post office clerk/postmaster to provide the vocational expert with additional information about that job (Tr. at 93-94).

before him that same had been completed (Tr. at 24-25, 915, 1046, 1087). From this evidence, the ALJ nevertheless "added further limitations . . . and boundaries on handling, fingering and feeling" (Tr. at 27).

Thus, to the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, contrary to Claimant's arguments otherwise, the ALJ did accommodate her credibly-established limitations resulting from her impairments in the hypotheticals to the vocational expert as outlined *supra*.

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she could perform a limited range of sedentary work during the relevant eleventh-month period, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, such as imaging and examination findings, as well as the other evidence of record, including Claimant's own statements; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of performing substantial gainful activity during the relevant

period provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment, including the controlling hypothetical questions posed to the vocational expert, were based upon substantial evidence.

Finally, the undersigned further **FINDS** that the final decision denying Claimant's application for benefits is also supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 10), **GRANT** the Defendant's request to affirm the decision below (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: June 25, 2021.



Omar J. Aboulhosn
United States Magistrate Judge